### M. WITMARK & SONS v. L. BAMBERGER & CO.

(District Court, D. New Jersey. August 11, 1923.)

1. **Copyrights ⬅66—Department store broadcasting song by radio held to do so for "profit."**

A department store selling radio equipment and conducting radio broadcasting station, the cost of which is charged against expenses of the business, in broadcasting therefrom a copyrighted song does so for "profit" within the Copyright Act 1909 (Comp. St. § 9517 et seq.), especially where it precedes its programmes by broadcasting its own name and business slogan.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Profit.]

2. **Copyrights ⬅75—No defense that broadcasting of song advertises it.**

It is no defense to suit for infringement of copyright on a song by broadcasting it from radio broadcasting station that the song is thereby advertised, as copyright owner has the privilege of choosing his own method of advertising.

In Equity. Suit by M. Witmark & Sons against L. Bamberger & Co. Decree for plaintiff.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J., and Samuel M. Hollander, of Newark, N. J. (Thos. G. Haight, of Jersey City, N. J., and Nathan Burkan, of New York City, of counsel), for plaintiff.

Pitney, Hardin & Skinner, of Newark, N. J. (Alfred F. Skinner, of Newark, N. J., of counsel), for defendant.

LYNCH, District Judge. [1] The defendant conducts a gigantic department store in the city of Newark, N. J., and sells its wares at retail throughout the state of New Jersey, if not in adjacent states. Since February, 1922, it has conducted a radio department wherein radio equipment of all sorts is sold. It has also established and conducts a licensed radio broadcasting station known as Station WOR, from which vocal and instrumental concerts and other entertainment

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and information are broadcasted on a wave length of 405 meters. The plaintiff owns the musical composition entitled "Mother Machree," and under the Copyright Act of 1909 (Comp. St. § 9517 et seq.) possesses the exclusive right to perform that composition publicly for profit.

The plaintiff, alleging that the defendant performed, or caused to be performed, its composition "Mother Machree" by means of singing from the broadcasting station WOR and that this performance by the defendant was publicly for profit, prays that a preliminary injunction issue restraining the defendant from the further performance of its copyrighted song. The defendant denies that this broadcasting of the copyrighted "Mother Machree" was or is *for profit,* its contention being that because everything it broadcasts is broadcasted without charge or cost to radio listeners, there is no performance *publicly for profit* within the meaning of the Copyright Act.

It being extremely unlikely that any facts developed upon final hearing will alter the undisputed situation now presented, and both parties desiring a speedy final determination of the issue, the court is disposed, at this time, to register its conclusions as to the law.

The question simmered down is: What is meant by the words "publicly for profit"? Fortunately, those words have been construed by the United States Supreme Court in the case of Herbert v. Shanley Co., 242 U. S. 591, 37 Sup. Ct. 232, 61 L. Ed. 511, a case frequently referred to by counsel on both sides of this cause. The facts there were as follows: The Shanley Company conducted a public restaurant in New York City wherein was located a platform or small stage upon which orchestral selections were rendered, and songs were sung by paid performers for the entertainment of persons visiting the restaurant. No admission fee was charged. The owner of a copyrighted song known as "Sweethearts," alleging that his property rights were being invaded because his song was being sung by Shanley's performers, sought injunctive relief in the United States courts for the Southern District of New York. This relief was denied, it being the view of the District Judge (and the Judges of the Circuit Court of Appeals concurred) that because no admission was charged at the door of the restaurant, there was no performing of the song "Sweethearts" *publicly for profit* within the meaning of the Copyright Act. The United States Supreme Court, however, took a different view. Justice Holmes, in speaking for the court of last resort, had this to say:

"If the rights under the copyright are infringed only by a performance where money is taken at the door they are very imperfectly protected. Performances not different in kind from those of the defendants could be given that might compete with and even destroy the success of the monopoly that the law intends the plaintiffs to have. It is enough to say that there is no need to construe the statute so narrowly. The defendants' performances are not eleemosynary. They are part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order, is not important. It is true that the music is not the sole object, but neither is the food, which probably could be got cheaper elsewhere. The object is a repast in surroundings that to people having limited powers of conversation or disliking the rival noise give a luxurious pleasure not to be had

from eating a silent meal. If music did not pay it would be given up. If it pays it pays out of the public's pocket. Whether it pays or not the purpose of employing it is profit and that is enough. Decrees reversed."

It is strenuously argued in behalf of the defendant in the instant cause that it was the view of the court of last resort that the facts, as developed in the Shanley situation, showed that there was a *direct* charge to those who patronized the restaurant—a *direct* charge for and on account of music which was collected from persons dining there. So far as appears, there was only one "item" charged for, to wit, food. In fixing the charge for food the restaurant proprietor undoubtedly took into consideration many items in addition to the cost of the food and the preparation and service of it. There was "attributed to" the "item" food the musical entertainment and other attractions afforded the patrons. The diner at no time had the subject of entertainment charge called to his attention except in the high price of the food which he was permitted to procure. This, in our opinion, was an *indirect* way of collecting the charge for musical entertainment from those who were there to pay. To constitute a direct charge, it seems to us that there would have to be an admission fee charged at the entrance to the dining hall or a specific fee for entertainment would have to be charged the listener either while in or about to leave the premises.

There is another case which strikes us as being quite helpful. In the case of Harms et al. v. Cohen, 279 Fed. 276, District·Judge Thompson held that the playing of copyrighted music by a pianist in a motion picture theater was an infringement of the copyright and relief was accorded the owner thereof. In that case an admission charge was collected from all who entered the theater for the purpose of viewing motion pictures. Incidental to the exhibition was the playing by a pianist of music which, to the pianist, seemed appropriate to the development of the play or events which were being portrayed on the screen. No selection of music was made up by the proprietor of the theater or consented to by him in any way. There was no fee for musical entertainment called to the attention of the patron of the theater at any time.

The pianist being permitted to use his own judgment as to what musical selections to play, played the musical composition entitled "Tulip Time" from the "Ziegfield Follies, 1919." It was held by Judge Thompson that the furnishing of music was an attraction which added to the enjoyment of persons viewing the motion pictures, and that although the proprietor had nothing whatever to do with the selection of the musical compositions rendered, the fact that the pianist was paid by the proprietor to supply the music moved the court to hold that the proprietor was furnishing music *publicly for profit*. There being no *direct* charge on account of musical entertainment furnished, there was what we term an *indirect* charge or fee therefor.

If our construction of the opinion of the Supreme Court in the Shanley Case, supra, be sound, that is to say, if there was found to be an *indirect* charge for the use of copyrighted musical compositions because of which the court held that the owner of the copyright was

entitled to relief, the problem now presented for solution is not so difficult.

We have already stated that the Bamberger Co. makes no *direct* charge to those who avail themselves of the opportunity to listen to its daily broadcasting programmes. The question then is: Is the broadcasting done *for* an *indirect* profit? In determining this we think it is proper to look to the reason for broadcasting at all. Why was it done? What was it done for? What was the object, or to use the term of Justice Holmes: What was the "purpose"? We know the purpose of the restaurant proprietor, and we know the purpose of the proprietor of the moving picture theater. What was the purpose of the defendant in expending thousands of dollars in establishing and operating this broadcasting station?

Adopting the language of Justice Holmes, the defendant is not an "eleemosynary institution." A department store is conducted for profit, which leads us to the very significant fact that the cost of the broadcasting was charged against the *general expenses of the business.* It was made a part of the business system.

Next we have the fact, already referred to, that the defendant sells radio receiving instruments and accessories. Whether a profit has resulted from such sales is not material in determining the object. It is within the realms of probability that many departments of a large store at times show losses rather than profits. Paraphrasing the comments of Justice Holmes, "Whether it pays or not the purpose is profit, and that is enough." While the defendant does not broadcast the sale prices of its wares, or refer specifically thereto, it does broadcast a slogan which appears in all of the defendant's printed advertisements. That slogan, which is, "L. Bamberger & Co., One of America's Great Stores, Newark, N. J.," is broadcasted at the beginning of every periodical programme and also at the conclusion thereof. A person listening to the programme of WOR will hear at the beginning the statement that L. Bamberger & Co. regard themselves as the proprietors of one of America's great stores.

If the development or enlargement of the business of the department store was completely out of the minds of the promotors of this broadcasting enterprise, is it reasonable to believe that the slogan, "L. Bamberger & Co., One of America's Great Stores, Newark, N. J.," would be announced to all listeners one, two, three, four, five, or six times a day? If the defendant desired to broadcast for purely eleemosynary reasons, as is urged, is it not likely that it would have adopted some anonymous name or initial? Undoubtedly the proprietors in their individual capacities have done and do many things of a public spirited and charitable nature on account of which they are entitled to the highest commendation. But it does not appear, and the court cannot believe, that those charitable acts are all labeled or stamped, "L. Bamberger & Co., One of America's Great Stores, Newark, N. J."

[2] There is another point which, although striking us as immaterial, deserves some comment. The defendant argues that the plaintiff should not complain of the broadcasting of its song because of the

great advertising service thereby accorded the copyrighted number. Our own opinion of the possibilities of advertising by radio leads us to the belief that the broadcasting of a newly copyrighted musical composition would greatly enhance the sales of the printed sheet. But the copyright owners and the music publishers themselves are perhaps the best judges of the method of popularizing musical selections. There may be various methods of bringing them to the attention of music lovers. It may be that one type of song is treated differently than a song of another type. But, be that as it may, the method, we think, is the privilege of the owner. He has the exclusive right to publish and vend, as well as to perform.

Considering all of the facts and circumstances, it is the conclusion of the court that the broadcasting of the defendant was publicly for profit within the meaning of the Copyright Act as that meaning has been construed by the United States Supreme Court.

A decree will be entered in favor of the plaintiff, but restraint will be withheld pending a review of this opinion.